Filed 4/18/18

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE


| | |
|---|---|
| COUNTY OF LOS ANGELES, | B278519 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BS156018) |
| v. | |
| LOS ANGELES COUNTY CIVIL SERVICE COMMISSION, | |
| Defendant and Respondent; | |
| CARLOS ARELLANO, | |
| Real Party in Interest and Respondent. | |


APPEAL from a judgment of the Superior Court of Los Angeles County, Mary H. Strobel, Judge.  Affirmed.

Peterson•Bradford•Burkwitz, Avi Burkwitz, Craig Marinho and Jessica Y. Lee  for Plaintiff and Appellant.

No appearance for Defendant and Respondent.

The Gibbons Firm and Elizabeth J. Gibbons for Real Party in Interest and Respondent.

Based on phone calls legally intercepted by law enforcement during a drug trafficking investigation, investigators came to believe that Carlos Arellano (Arellano), then a detective with the Los Angeles County Sheriff's Department (Sheriff's Department), was associating with known narcotic felons, using his law enforcement status to obtain inside information from the department to provide to individuals involved in illegal narcotic activity, and was himself involved in cultivating marijuana. As the Sheriff's Department expanded its criminal investigation to include Arellano, it sought a court order releasing the wiretap recordings, and transcripts from those recordings, to the Sheriff's Department for use against Arellano. The court's order permitted the district attorney to release the wiretap evidence to the Sheriff's Department and further authorized testimony regarding the evidence pursuant to Penal Code section 629.78.[1]

Although the Sheriff's Department closed its criminal investigation without filing charges, the department later sought to discharge Arellano from his position. During the civil service commission hearing that followed, the Sheriff's Department attempted to use the intercepted calls during the administrative proceeding. The hearing officer granted Arellano's motion to suppress the calls and ultimately recommended that the Arellano only receive a five day suspension without pay. The civil service commission adopted the recommendation. The County of Los Angeles then filed a petition for writ of administrative mandamus in superior court. The superior court denied the petition. We affirm

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

## BACKGROUND

### I.    The initial investigation

Arellano was hired by the Sheriff's Department in 1989. Arellano later joined the Sheriff's Department Narcotics Unit and was transferred to the Palmdale station as the filing detective on loan. As part of this assignment, Arellano would check to see if deputies had made any narcotics arrests, review the suspect's booking packets and files, and determine whether the suspect might serve as a potential informant. Arellano would also determine whether the suspect's case should be sent to the district attorney's office for filing of criminal charges.

On February 23, 2009, the Sheriff's Department Narcotics Strike Team (NST) conducted a controlled purchase of cocaine near the El Dorado restaurant in Palmdale under the belief that the restaurant's owners were involved in illegal conduct. Arellano, assigned to NST at the time, was not aware of this operation because he was still on loan to the Palmdale station. After the controlled purchase was complete, Detective Angela Riggs told her supervisor, Sergeant Phil Morris, that Arellano was related to the owners of the El Dorado, Omar Monreal and Francisco Monreal. Detective Riggs also said that Arellano had thrown a party at the El Dorado to celebrate his transfer from patrol to narcotics, despite departmental policies forbidding fraternization with criminals. Although Arellano was not in fact related to Omar Monreal or Francisco Monreal, Arellano did know Omar Monreal. Arellano also knew Eric Monreal, another Monreal brother, whom he had met at the El Dorado through Omar Monreal.

In March 2009, the high intensity drug trafficking area (HIDTA) task force began investigating Arellano to determine if

3

he was engaged in any criminal activity. Detective Mark Montoya worked as the lead criminal investigator on the case. In April 2009, HIDTA obtained several court-ordered state wiretaps, issued by Judge Larry P. Fidler.[2] Among the intercepted calls were 26 calls between Omar Monreal and others discussing illegal narcotics activity. Two of the calls were between Omar Monreal and a caller identified as UM845 and UM9068. After conducting voice comparisons of UM845, UM9068, and Arellano, five Spanish linguists signed declarations opining that UM9068 and UM845 were Arellano.

On April 23, 2009, agents intercepted a call between Omar Monreal and UM845 (Arellano) during which the two men discussed marijuana plants, money, and the weight of the product. During this conversation, Arellano told Omar that the cloned plants he had purchased infested the other marijuana plants with "spider mites." Arellano asked Omar about money and told him that he (Arellano) needed the money, "Hey, what's up with the money dude? I need the money, man!" After discussing the weight of the product and a getting a certain room "ready," the conversation ended with Arellano telling Omar several times "[d]on't burn me man!" and that he would see Omar the next day.

On June 9, 2009, several hours after law enforcement searched Omar Monreal's residence, agents intercepted a call between UM9068 (Arellano) and Omar that appeared to disguise the true nature of the call. The two discussed a traffic accident at the intersection of "40th" and "Avenue L" although investigators concluded no such accident had occurred at that location.

---

[2] Arellano was not a target subject in these wiretaps.

4

Arellano told Omar, "Well, like I said, whatever you need, let me know . . . on this thing . . . I could only tell you what I hear." Arellano also told Omar "[whatever you need] [or] you guys or your mom, your dad, anybody, your brothers, . . . [call me]." Arellano also told Omar, "they try to keep a lot of things hush hush because . . . You know, they found out about me and then they found out that [stutters] that a lot of Deputies would hang out there."

On June 11, 2009, agents intercepted a call between Omar and Eric Monreal. Omar and Eric discussed the purported traffic accident at the intersection of 40th and Avenue L. Omar told Eric that law enforcement were called to the accident and said, "Yeah, they went over there and I called Arellano and he called them so they could chill on 'em."

On June 16, 2009, agents intercepted a call between Omar and Felipe Rios. Felipe asked Omar if Arellano had called back yet, and Omar responded that he called Arellano three times today, but Arellano had not called back. On June 17, 2009, agents intercepted another call between Omar and Felipe Rios. Omar said Arellano had advised him how to conceal the fact that he (Omar) knew about an indoor marijuana grow and how to disassociate himself from the grow location by showing that he tried to evict tenants from the home before the law enforcement raid. Omar said that Arellano advised him to post eviction notices, "I just briefly spoke to him and he told me, 'you know what? Post the three (3) uh, the, the forty-eight (48) hours . . . the notice and then we'll go over there.' " Omar then said, "So, I, I told him (Arellano) 'cool, we'll get it done.' Right now I'm about to print it out, give me about fifteen (15) minutes and I'll print it out and we'll post it."

5

## II. The investigation into Arellano

On June 25, 2009, the Sheriff's Department Internal Criminal Investigations Bureau (ICIB) opened a criminal investigation into Arellano. On November 30, 2009, while the ICIB investigation proceeded, Detective Montoya and Deputy District Attorney Jay Grobeson filed an application to Judge Fidler for an order releasing wiretap recordings, and transcripts of those recordings, to the Sheriff's Department for use against Arellano. The application sought "authorization to release recordings and other materials (line sheets) for specific calls . . . to the Los Angeles County Sheriff Department for use in an internal investigation." The application further stated that the "evidence derived therefrom [the intercepted recordings] are relevant to an internal investigation by the Los Angeles County Sheriff Department."

Detective Montoya's declaration in support of the application reiterated that the recordings were relevant to the Sheriff's Department internal investigation of Arellano: "The Los Angeles County Sheriff Department is considering an internal investigation into the actions of the deputy, and the recording(s) during this period of interceptions covered by the referenced Wiretaps is relevant to that investigation." The declaration further stated that "[i]n order to proceed administratively to prevent any future public offense by Detective Carlos Arellano, the Los Angeles Sheriff Department needs access to the specific related intercepted calls."

On December 1, 2009, Los Angeles Superior Court Judge Larry P. Fidler signed an order authorizing the disclosure of those records pursuant to the application. The order provided, in relevant part: "The People have made application to this court

6

for an order pursuant to Penal Code Section 629.82. This court has read and considered said application. [¶] IT IS HEREBY ORDERED that the District Attorney for the County of Los Angeles may release such information and documentation, including, but not limited to: [¶] 1. Monitor Logs; . . . [¶] 2. Recordings of intercepted calls; . . . [and] [¶] 3. Evidence derived from these Wiretaps . . . . [¶] The Court further authorizes pursuant to Penal Code § 629.82(b), testimony of the above items pursuant to Penal Code § 629.78."

On July 6, 2010, Drug Enforcement Administration Special Agent Virginia Waters and Detective Montoya concluded their criminal investigation into Arellano. In August 2010, the ICIB closed its investigation without filing criminal charges because Arellano's intercepted conversations solely involved marijuana activity, which is not a prosecutable offense under California wiretap authority. After the ICIB closed its investigation, the matter was referred to the Sheriff's Department Internal Affairs Bureau (IAB) based on Arellano's alleged violations of multiple departmental policies. The IAB began its investigation in August 2010 and ended it a year later. As part of the IAB investigation, the Sheriff's Department had access to the wiretapped calls.

In addition to the conduct described above, the Sheriff's Department also determined that Arellano performed favors for Eric Monreal and other individuals involved in illegal narcotics activity. In August 2008, Eric Monreal was arrested for a felony narcotics charge and placed on a probation hold, meaning he was not to be released. Without obtaining supervisor approval and despite the valid probation hold, Arellano released Eric from jail. It was shortly after Eric's release that Arellano held a party at the El Dorado to celebrate his transfer to the narcotics bureau.

The Sheriff's Department also determined that Arellano associated with a federal fugitive named Abraham Angulo. Angulo was Arellano's brother-in law although Arellano did not report the relationship to the Sheriff's Department. In August 2008, Arellano asked a sergeant to determine if Angulo was "wanted." After Angulo's status as a federal fugitive was confirmed, Arellano refused to provide information to enable the Sheriff's Department to apprehend Angulo.

The Sheriff's Department also found that Arellano engaged in unauthorized use of the justice data interface system (JDIC). JDIC is a departmental database that allows employees to search for confidential information on suspects, criminals, and fugitives. Deputies must be certified annually on the JDIC system and have an individual password to log onto the system. Arellano was trained and certified to use the JDIC system on August 20, 1998. He never got recertified, however, and had been dependent upon support staff and other deputies to run his searches. On or about June 8, 2009, Arellano used the password belonging to Deputy Henry Corral to access the JDIC system and obtain information regarding several individuals engaged in criminal activity.

On August 8, 2011, the Sheriff's Department issued its notice of intent to discharge Arellano from his position of Deputy Sheriff citing multiple departmental policy violations. On August 24, 2011, the Sheriff's Department issued its notice of final discipline finding that Arellano violated the department's Manual of Policy and Procedures relating to general behavior, prohibited association, fraternization, professional conduct, obstruction of an investigation, and false statements. Arellano

8

was discharged from his position as Deputy Sheriff effective August 29, 2011.

## III.    The administrative hearing

The Los Angeles County Civil Service Commission hearing regarding Arellano's discharge took place from September 2012 to February 2014.  During the hearing, Arellano filed a motion to suppress the wiretapped calls.  The Sheriff's Department opposed the motion.  The hearing officer granted the motion after finding that Judge Fidler's December 1, 2009 order permitting the wiretap evidence to be released did not expressly provide that the evidence could be used for administrative purposes.  Instead, the hearing officer interpreted the order to authorize disclosure of the wiretap evidence only in criminal court or grand jury proceedings pursuant to section 629.78.

On September 11, 2013, the Sheriff's Department filed an ex parte application seeking an order clarifying or amending Judge Fidler's December 1, 2009 order.  During the hearing, Judge Fidler stated that although the order as prepared by the district attorney could be considered ambiguous, "the application clearly noted that they intended to use the results in an internal affairs hearing against [Arellano]."  Judge Fidler also stated that his intent was "to allow [the wiretap evidence] to be used not just in a trial, not just before a grand jury, but if they chose to proceed against the officer or do anything they could use the materials."  Judge Fidler further noted, "I would say this is a pretty simply, cut and dry request.  I guess I can understand where the hearing officer, perhaps, had a problem.  But if read in context, it is clear the order requested that I do so.  Unfortunately, the district attorney referred to a section, a specific section that was contained in the order that would have prevented it, but if it's

9

read in its entirety—and my order says I have read and considered the application—why would I sign it unless—if I was planning on keeping something out, I would have stated it or written over it by hand." Indeed, Judge Fidler concluded, "So I intended—my order intended that this material be used against [Arellano] in his administrative hearing. I can't state it any clearer than that." According to Judge Fidler, the only thing preventing such use, "is a poorly drafted order from the district attorney." Judge Fidler declined to modify the actual order, however, stating that he did not believe he was allowed do so. Judge Fidler also noted that the Sheriff's Department and District Attorney could request an amendment of the order and he would consider complying with such a request. The record does not reflect any subsequent request to Judge Fidler to amend the order, however.

The hearing officer upheld her decision to exclude the wiretap evidence based on Judge Fidler's decision not to amend the order. "I want the record to be clear," the hearing officer told the parties. "At no time did I think I needed a clarification of the intent of the court. I always believed and still believe that it was the court's intent to issue an order that would permit the use of the wiretap evidence in an administrative proceeding." However, the hearing officer continued, she could not ignore "the letter of the order because I understand [Judge Fidler's] intent." Absent a modification of the order, the hearing officer determined she had no authority to admit the wiretap evidence in the administrative proceeding. The hearing officer declined to address whether California wiretap law permitted disclosure or use of the intercepted calls in an administrative proceeding, stating she was

10

"bound by the specific order of the court" and that the statutory interpretation would be left for appeal.

Without the wiretap evidence, the Sheriff's Department was only able to introduce evidence of Arellano's use of another deputy's credentials to access the JDIC system as well as his unauthorized release of Eric Monreal from the probation hold. At the conclusion of the hearing, the hearing officer ultimately found that Arellano had only violated the Sheriff's Department policy prohibiting access to the JDIC system without certification. On June 25, 2014, the hearing officer issued a written decision recommending that the Sheriff's Department decision to terminate Arellano be reduced to a five-day suspension without pay. On March 18, 2015, the civil service commission issued an order adopting the hearing officer's findings and recommendation to reduce Arellano's discharge to a five-day suspension.

On May 13, 2016, the County of Los Angeles (the County) filed a petition for writ of administrative mandamus in superior court. On July 14, 2016, the superior court denied the petition. The superior court found that Judge Fidler's order only authorized the Sheriff's Department to use the intercepted calls in an internal investigation and not in an administrative law proceeding as the latter would involve a more public disclosure. The superior court further found that although the California Wiretap Act allows for disclosure of the wiretap communications without a court order, the wiretap evidence here did not meet the standard for disclosure to prevent a public offense under section 629.82, subdivision (b), because there was no evidence of ongoing misconduct or the imminence of Arellano's commission of a public offense.

11

## STANDARD OF REVIEW

Under Code of Civil Procedure section 1094.5, there are two alternative standards of review that a trial court uses to review a petition for writ of administrative mandamus. (*JKH Enterprises, Inc. v. Department of Industrial Relation*s (2006) 142 Cal.App.4th 1046 (*JKH Enterprises*).) "If the administrative decision involved or substantially affected a 'fundamental vested right,' the superior court exercises its independent judgment upon the evidence disclosed in a limited trial de novo in which the court must examine the administrative record for errors of law and exercise its independent judgment upon the evidence." (*Id*. at p. 1057.) "Where no fundamental vested right is involved, the superior court's review is limited to examining the administrative record to determine whether the adjudicatory decision and its findings are supported by substantial evidence in light of the whole record." (*Ibid*.)

In this case, the trial court did not explicitly state which standard of review it was employing. However, regardless of the standard of review that applied in the trial court, appellate courts apply a substantial evidence standard. (*JKH Enterprises*, *supra*, 142 Cal.App.4th at p. 1058.) If the trial court exercised its independent judgment because a fundamental vested right was involved, we review whether substantial evidence supports the trial court's judgment. (*Ibid*.) If the trial court reviewed the administrative decision for substantial evidence because no fundamental vested right was involved, then our review is the same as the trial court's—we review the administrative record to determine whether substantial evidence supports the agency's findings. (*Ibid*.) In that review, we resolve all conflicts in the evidence and draw all inferences in support of the agency's

12

findings.  (*Ibid*.)  However, we review de novo issues of law related to the administrative decision, such as interpretation of statutes and regulations.  (*Hoitt v. Department of Rehabilitation* (2012) 207 Cal.App.4th 513, 522.)

## RELEVANT PENAL CODE SECTIONS

Under section 629.74, "[t]he Attorney General, any deputy attorney general, district attorney, or deputy district attorney, or any peace officer who, by any means authorized by this chapter, has obtained knowledge of the contents of any wire or electronic communication, or evidence derived therefrom, may disclose the contents to one of the individuals referred to in this section, to any judge or magistrate in the state, and to any investigative or law enforcement officer . . . to the extent that the disclosure is permitted pursuant to Section 629.82 and is appropriate to the proper performance of the official duties of the individual making or receiving the disclosure."  However, "[n]o other disclosure, except to a grand jury, of intercepted information is permitted prior to a public court hearing by any person regardless of how the person may have come into possession thereof."

Under section 629.76, "[t]he Attorney General, any deputy attorney general, district attorney, or deputy district attorney, or any peace officer or federal law enforcement officer who, by any means authorized by this chapter, has obtained knowledge of the contents of any wire or electronic communication, or evidence derived therefrom, may use the contents or evidence to the extent the use is appropriate to the proper performance of his or her official duties and is permitted pursuant to Section 629.82."

Under section 629.78, "[a]ny person who has received, by any means authorized by this chapter, any information concerning a wire or electronic communication, or evidence

13

derived therefrom, intercepted in accordance with the provisions of this chapter, may, pursuant to Section 629.82, disclose the contents of that communication or derivative evidence while giving testimony under oath or affirmation in any criminal court proceeding or in any grand jury proceeding."

Under section 629.82, subdivision (a), if a law enforcement officer, while intercepting wire or electronic communications in an authorized manner, intercepts wire or electronic communications relating to crimes other than those specified in the authorization order, but which are listed in section 629.52, subdivision (a), or any violent felony as defined in section 667.5, subdivision (c), then "(1) the contents thereof, and evidence derived therefrom, may be disclosed or used as provided in Sections 629.74 and 629.76 and (2) the contents and any evidence derived therefrom may be used under Section 629.78 when authorized by a judge if the judge finds . . . that the contents were otherwise intercepted in accordance with the provisions of this chapter."

Under section 629.82, subdivision (b), if a law enforcement officer, while intercepting wire or electronic communications in an authorized manner, intercepts wire or electronic communications relating to crimes other than those specified in subdivision (a), then "the contents thereof, and evidence derived therefrom, may not be disclosed or used as provided in Sections 629.74 and 629.76, except to prevent the commission of a public offense."

## DISCUSSION

We must resolve two issues in this appeal—Did Judge Fidler's December 1, 2009 order authorize the disclosure and use of the wiretap evidence at Arellano's administrative

14

hearing before the civil service commission?  If not, could the wiretap evidence be disclosed and used at the administrative hearing without a court order?  As discussed below, we answer both questions in the negative.

Judge Fidler's order was two-fold.  The order first allowed release of the wiretap evidence to the Sheriff's Department for use in an internal investigation.  Next, the order authorized testimony regarding the wiretap evidence pursuant to section 629.78.  However, section 629.78 allows for disclosure of such evidence only while testifying in a criminal or grand jury proceeding.  Thus, nothing in Judge Fidler's order expressly authorized disclosure or use of the wiretap evidence in an administrative hearing against Arellano.

The County argues that the Sheriff's Department's application made it clear that the release of the wiretap evidence was for use in an administrative proceeding such as a hearing before the civil service commission.  However, the first page of the application requested release of the evidence "for use in an internal investigation"—not an administrative proceeding.  In its accompanying points and authorities, the department argued that disclosure of the evidence at an administrative hearing was not precluded by section 629.78.  But the attached declaration again reiterated that the intercepted calls were relevant to the department's internal investigation of Arellano:  "The Los Angeles County Sheriff Department is considering an internal investigation into the actions of the deputy, and the recording(s) during this period of interceptions covered by the referenced Wiretaps is relevant to that investigation."  The declaration also stated that "[i]n order to proceed administratively to prevent any future public offense" by Arellano, the department needed access

15

to the intercepted calls.  The declaration further requested authorization to release such evidence "as necessary to assist in the administrative process" and "to prevent ongoing public corruption."

The declaration appeared to use the terms "release" and "disclose" interchangeably, seeking release of the evidence *to* the Sheriff's Department as well as authorization to "release" or, in this context, disclose, the evidence during the administrative process.  Nevertheless, even if the application and declaration can be reasonably interpreted as communicating that the Sheriff's Department intended to use the intercepted calls in an internal investigation and when proceeding administratively against Arellano, the prepared order signed by Judge Fidler did not authorize disclosure or use of the wiretap evidence in an administrative proceeding.  Instead, the order cited sections 629.82, subdivision (b), and 629.78, neither of which provides for disclosure or use of such evidence in an administrative proceeding.  In other words, although the order permitted release of the intercepted calls to the Sheriff's Department, its cited statutory parameters limited disclosure of and testimony about the calls to a criminal court or grand jury proceeding pursuant to section 629.78.  Therefore, the order did not authorize disclosure or use of the wiretap evidence in any other kind of proceeding, including an administrative hearing before the civil service commission, which could involve more public disclosure than an internal departmental investigation.[3]

---

[3] Under Los Angeles Civil Service Commission rule 4.11, "[a]ll meetings of the Commission shall be open to the public . . . except as otherwise provided by rule or law."  However, according to rule 4.05, "[t]he Commission may meet in Executive

16

According to the County, the term "release" as stated in the order actually meant "release and use." Thus, when Judge Fidler released the wiretap evidence to the Sheriff's Department, he also allowed the department to subsequently use the evidence in any proceeding identified in the application or declaration. The County argues that because Judge Fidler "further" authorized testimony regarding the evidence in a criminal court or grand jury proceeding, he must have first authorized testimony in another setting, i.e., an administrative hearing. Although section 629.76 allows law enforcement to use wiretap evidence "to the extent the use is appropriate to the proper performance of his or her official duties and is permitted under [s]ection 629.82," Judge Fidler's order plainly did not cite section 629.76. Instead, the order relied on section 629.78, which allows law enforcement to disclose wiretap evidence only when testifying in criminal court or before a grand jury. Thus, we read the order just as it is written—Judge Fidler released the wiretap evidence to the Sheriff's Department and also allowed the department to disclose the evidence only in a criminal or grand jury proceeding. Although Judge Fidler subsequently stated he intended to allow the evidence to be used in an administrative proceeding as well, the County cites no authority that would allow us to consider anything other than the four corners of the order. Nor has the County cited any authority holding that a judge's intent may expand the express limited scope of an operative statute. Thus, we hold that the order did not authorize the disclosure or use of

Session to consider the . . . discipline, or dismissal of public employees unless an employee or the employee's representative requests that the employee's matter be considered only in public."

17

the wiretap evidence at Arellano's administrative hearing before the civil service commission.

The County next contends that the order's defects are immaterial because the evidence could be disclosed or used at the administrative hearing even without a court order. We disagree. Even if the state statutes relied upon by the County do not require that law enforcement obtain judicial authorization prior to disclosure or use, the County cannot satisfy the conditions imposed by the cited statutes.

In interpreting a state wiretap scheme, an appellate court may look for guidance to cases under the federal wiretap act, which "provides 'a comprehensive scheme for the regulation of wiretapping and electronic surveillance.' "[4] (*People v. Otto* (1992) 2 Cal.4th 1088, 1097.) The federal wiretap act sets minimum standards for the admissibility of evidence procured through electronic surveillance. "[S]tate law cannot be less protective of privacy than the federal [wiretap] [a]ct." (*Id.* at p. 1098.)

The County argues that although crimes involving the cultivation or importation of marijuana are not specifically covered under section 629.52, subdivision (a), of the wiretap authorization statute,[5] the intercepted calls relating to these

---

[4] See title III of the Omnibus Crime Control and Safe Streets Act of 1968, title 18 United States Code sections 2510 to 2520.

[5] Specified offenses under section 629.52, subdivision (a), include the importation, possession for sale, transportation, manufacture, or sale of heroin, cocaine, PCP, or methamphetamine, but do not include the cultivation or importation of marijuana. Furthermore, although Arellano was intercepted during the wiretap, the County does not contend he was listed as a target subject in the wiretap application.

crimes may nevertheless be disclosed or used pursuant to section 629.82, subdivision (b). Under section 629.82, subdivision (b), if a law enforcement officer, while intercepting wire or electronic communications in an authorized manner, intercepts wire or electronic communications relating to a non-specified offense, the evidence may not be disclosed or used (as provided in sections 629.74 and 629.76) except to prevent the commission of a public offense. In other words, the evidence may be disclosed or used only if doing so would prevent the commission of a public offense.[6]

A "public offense" is defined, in relevant part, as "an act committed . . . in violation of a law," which is punishable by "[d]eath; [¶] [i]mprisonment; [¶] fine; [¶] [r]emoval from office; or [¶] [d]isqualification to hold and enjoy any office of honor, trust or profit in this state." (§ 15.) Thus, the cultivation or importation of marijuana would fall under this definition. However, the Sheriff's Department did not issue its notice of intent to discharge Arellano until August 2011, at least two years after he was intercepted discussing these offenses, and the administrative hearing did not begin until September 2012. Therefore, without additional evidence demonstrating Arellano's continued involvement in these crimes, it is difficult to see how

---

[6] The trial court found that section 629.82 does not require a court order. Conversely, the hearing officer believed that section 629.82 did require judicial authorization. We need not decide which view is correct given that the County failed to satisfy the statute's requirements. However, we note that legislative action could resolve the critical issue raised by this case; whether, as a matter of course, calls captured during a lawful wiretap may be disclosed and used during a subsequent civil service commission hearing.

19

disclosure or use of the wiretap evidence during the administrative hearing could have prevented the commission of a public offense.

This was a historical case, in which the intercepted calls revealed Arellano's past misconduct.  By September 2012, fresh evidence was needed to show that disclosure or use of the calls would prevent a crime from occurring.  The County highlights the *absence* of evidence to make its point, arguing there was no evidence that Arellano no longer associated with "known narcotic felons" when the administrative hearing took place.  Leaping from this slim reed into thin air, the County then argues that disclosure or use of the intercepted calls thus would have prevented ongoing violations of obstructing a peace officer, being an accessory after the fact to a crime (the cultivation of marijuana) and conspiring to commit a crime.  We are not persuaded.  Without evidence of a continued association, the County could not, and, indeed did not, demonstrate that any ongoing offenses could be prevented.  Thus, section 629.82, subdivision (b), cannot be construed to justify disclosure or use of the intercepted calls at the administrative hearing.[7]

The County also argues that disclosure or use was allowed pursuant to federal wiretap law.  Again, we are not persuaded. The most closely analogous federal statute, title 18 United States Code section 2517, subdivisions (3) and (5), allows for disclosure or use of intercepted information in *any* proceeding "held under

_____

[7] Although the parties further debate whether the wiretap evidence could be disclosed under section 629.74, or used under section 629.76, the discussion is unnecessary.  Both statutes still require compliance with section 629.82 and, as we have already held, the County failed to do so in this case.

20

the authority of the United States or of any State or political subdivision thereof." This language is far more expansive than section 629.78, which limits such proceedings to testimony in criminal court or before a grand jury. Although state law cannot be less protective of privacy than the federal wiretap act, (*People v. Otto*, *supra*, 2 Cal.4th at p. 1097; see *People v. Roberts* (2010) 184 Cal.App.4th 1149, 1179–1180), this is precisely the result the County seeks here. At issue in *Roberts* was California's more restrictive provision with respect to the timing and content of reports submitted during a wiretap. At issue here is California's more restrictive provision with respect to the disclosure and use of the wiretap's intercepted calls. As in *Roberts*, the significant difference in the scope of the privacy protection created by the California statute "indicates that [the state legislature] intended the statute not conform to federal law in this regard." (*Id*. at p. 1180.) Thus, relying upon federal wiretap act does not aid the County's position here. Nor does citation to factually distinguishable federal decisions—bound not by California law but by the far broader scope of the federal wiretap act—assist the County's contentions. (See, e.g., *Forsyth v. Barr* (5th Cir. 1994) 19 F.3d 1527.)

## DISPOSITION

The judgment is affirmed. The parties are to bear their own costs on appeal.

CERTIFIED FOR PUBLICATION.


JOHNSON, J.

We concur:


CHANEY, Acting P. J.          BENDIX, J.

21